STEWART, J.
LAt issue in this appeal is the ownership of mineral rights underlying two 20.2-acre tracts of land (“the disputed property”) in Caddo Parish. After a bench trial, the trial court denied the claims of the plaintiffs, who are the surface owners of the disputed property and who sought, along with other relief, to be declared owners of the mineral rights underlying their land. The plaintiffs now appeal. For the reasons set forth in this opinion, we affirm the trial court’s judgment.
FACTS
Plaintiffs Gene Bartlett Haskins (“Has-kins”) and spouses Preston William Ford and Elissa Amaral Ford (“the Fords”) filed suit on July 21, 2010, against spouses Clyde Lester and Mary Elizabeth Gunning Lester (“the Lesters”), along with Chesapeake Louisiana, L.P. (“Chesapeake”), for declaratory and injunctive relief plus damages. Later, the plaintiffs amended their petition to add PXP Louisiana, LLC, and Larchmont Resources, LLC, as defendants; both are assignees of Chesapeake. Plaintiffs also added Andrea Lynn Ford Braniff (“Braniff’) as a plaintiff; Braniff is the Fords’ daughter to whom they donated all their rights, title, and interest in one acre, more or less, of their land. References to the Fords’ claims will encompass Braniff s claims concerning the acre donated to her by her parents.
The Fords and Haskins each purchased 20.2 acres of land from the Lesters’ ancestors-in-title on April 19, 1977, in separate credit sale deeds. The gist of the plaintiffs’ 26-page petition is their claim to be declared owners of the mineral rights to the disputed property and to 12have certain mineral leases, particularly leases executed in June 2008 by the Lesters in favor of Chesapeake, to be reformed to reflect that they do not cover the disputed property. The plaintiffs claim that they obtained ownership of the mineral rights from the defendants ancestors-in-title by execution of the credit sale deeds and by accrual of the 10-year prescription of nonuse on April 19,1987.
The brief testimony adduced during the bench trial along with the 109 exhibits introduced into evidence by the parties established the relevant facts for determination of who owns the mineral rights at issue.[1] In 1935, the Lesters’ ancestor-in- *24 title, Elbert Moncrief (“Elbert”), purchased the following described property:
All of the North 1212 Feet of the Northeast Quarter (NE ⅜) of Section thirty four (34), containing 73.65 acres and all that part of the North 1212 Feet of the Northwest Quarter (NW ⅜) of Northwest Quarter (NW ⅝) of Section thirty five (35), lying westerly from the center line of the Greenwood Bethany Paved Road, containing 12.51 acres, all in Township Seventeen (17) North, Range Sixteen West ([2]16W), Caddo Parish, Louisiana[.]
At the time of the purchase, Elbert was married to Marie Burrow Moncrief (“Marie”), so the property was them community property. Elbert entered a mineral lease covering the property on March 23, 1953. By February 13, 1956, the TP SUK Minor Unit No. 1 Well, which covers a 640-acre production unit that includes the property purchased by Elbert, began producing and continues to do so today. The well was drilled to a depth of 9,059 feet.
| aAfter Elbert’s death on January 14, 1965, his will was probated and a judgment of possession was signed on March 23, 1965. The judgment of possession recognized Marie’s ownership of an undivided one-half interest in all the community property. As to Elbert’s half of the community property, Marie, as a legatee, was sent into possession of one-half of Elbert’s community property and granted a usu-fruct over the remainder. Burette Mon-crief Gunning (“Burette”) and George Elbert Moncrief (“George”), the children of Elbert and Marie, were sent into possession of an undivided one-fourth interest in the property of the deceased, subject to the usufruct in favor of Marie. In summation, Marie owned three-fourths of the former community property, while Burette and George had the naked ownership of the remaining undivided one-fourth of the property, subject to Marie’s usufruct.
On February 12, 1970, Marie executed a donation (hereafter “the 1970 donation”) involving two dispositions. First, Marie donated to George and Burette in equal portions “[a]ll of her right, title and interest” in land in “Sections 26, 27, 34 and 35, Township 17 North, Range 16 West” in Caddo Parish. Second, Marie donated a separate smaller tract to George. Following the two dispositions, the act of donation states:
Grantor reserves unto herself all of the oil, gas and other minerals in and under said property during the remainder of her life, together with all income from minerals from said property.
Grantor further reserves the right to live in the home last above described during the remainder of her life without payment of any rent on same.
|4The donation was an authentic act signed by Marie as grantor and by George and Burette as grantees before a notary public and two witnesses.
Eight months later, on October 10,1970, Marie, George, and Burette executed another authentic act relative to the donation. This instrument, which we will refer to as the “clarification instrument,” states in relevant part:
Whereas, by instrument dated February 12, 1970, Marie Burrow Moncrief executed a donation to her son, George Elbert Moncrief, and her daughter, Bu-rette Moncrief Gunning of certain properties, which instrument is recorded in the Records of Caddo Parish, Louisiana, under Instrument No. 499,960, and,
WHEREAS, it was the intention of all parties that Marie
*25 Burrow Moncrief did reserve all usu-fruct of income from the property during the remainder of her life,
NOW, THEREFORE, the parties do agree as follows:
That all income from minerals, timber, rights of way and any and all other income from said property is hereby the property of Marie Burrow Moncrief, and always has been her property during the remainder of her life.
Then on January 12, 1971, Marie and George executed another authentic act designated as a “Correction of Donation,” (hereafter “the correction instrument”) to correct the description of the property donated to George individually in the 1970 donation. After the corrected property description, the instrument states:
Grantor reserves unto herself the usu-fruct of all income from said property, including all income from minerals during the remainder of her life, together with the right to live in said property without payment of any rent.
|sOn April 19,1977, George, Burette, and Marie, in two separate but substantially identical acts, sold the disputed property to the Fords and Haskins.[2] Both credit sale deeds list George and Burette as vendors along with Marie, who is described as
“joining herein for the purpose of conveying all of her right, title and interest in and to the property, together with all reservations of minerals, income rights, timber rights, all rights of usufruct and habitation and all other rights in and to the below described property.”
The deeds also contain the following reservation:
George Elbert Moncrief and Burette Moncrief Gunning reserve all of the oil and gas, but not coal, lignite or shale; George Elbert Moncrief and Burette Moncrief Gunning stipulate that any income or revenue from the oil and gas rights shall be paid to Mrs. Marie Burrow Moncrief so long as she lives.
Marie died two years later. By the judgment of possession rendered in her succession on April 17, 1979, George and Burette were placed in possession of an undivided one-half interest each of all Marie’s property. Other exhibits in evidence establish the familial chain of title by which the Lesters claim ownership of the mineral rights at issue.
Both sides sought to present expert testimony from attorneys to assist the court in interpreting the donations and conveyances pertinent to a determination of ownership of the mineral rights in the | (¡disputed property.[3] Over objections by the plaintiffs, the trial court allowed the testimony of the defendants expert, Louis Linton Morgan (“Morgan”). The trial court believed it was required to accept Morgan as an expert because he had previously testified as an expert in other courts. However, the trial court refused to accept the plaintiffs’ expert, Philip E. Downer, III (“Downer”). The trial court appeared to agree with the defendants that Downer, *26 who was not practicing law when the relevant documents were drafted, lacked specialized knowledge of the customs and practices during that period. The plaintiffs proffered Downer’s testimony.
The dispute over the expert testimony was rendered a nonissue by the trial court’s reasons for judgment, which state that the trial judge did not base its findings on any parole evidence adduced at trial. Instead, the trial court based its ruling on the unambiguous authentic acts and succession judgments entered into evidence. The trial court found that the credit sale deeds (Exhibits 17 and 18) considered in light of the donation (Exhibit 13), the clarification instrument (Exhibit 15), and the correction instrument (Exhibit 16) failed to establish the plaintiffs’ ownership of the mineral rights underlying the disputed property. The trial court further found that the documentary evidence established the Lester defendants’ ownership rights. The trial court signed a final judgment on April 5, 2013, denying and dismissing the claims of the plaintiffs and assessing them with all costs. The |7plaintiffs’ appeal followed. They present three assignments of error for review.
DISCUSSION

Standard of Review

A trial court’s factual findings are entitled to great weight and will not be disturbed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). However, the interpretation of a contract generally presents a question of law that is subject to a de novo review on appeal. Mason v. Exco Operating Co., L.P., 48,713 (La.App.2d Cir.1/15/14), 132 So.3d 1004; Total Minatome Corp. v. Union Texas Products Corp., 33,433 (La.App.2d Cir.8/23/00), 766 So.2d 685. As stated, the trial court’s reasons for judgment indicate that it relied only on documentary evidence, not parol evidence, in reaching its judgment and that it found no ambiguity in the authentic acts and succession judgments entered into evidence. Therefore, we will conduct a de novo review of this matter.

First Assignment of Error

The plaintiffs assert that the trial court erred as a matter of law when it failed to find that they have owned all the mineral rights under the disputed property since April 19, 1987. In conjunction with this assignment of error, plaintiffs assert the following:
• the trial court failed to apply the open mines doctrine to determine the mineral interests held by Marie, George, | sand Burette by virtue of the judgment of possession rendered in Elbert’s succession;
• the trial court erred in finding that Marie did not convey all her mineral interests to the Fords and Haskins in the credit sale deeds;
• the trial court erred in failing to find that the mineral servitudes created in the credit sale deeds covered an undivided one-fourth interest in zones, reservoirs, and formations more than 9,059 feet below the surface of the disputed property; and
• the trial court erred in failing to find that the mineral servitudes in favor of George and Burette were extinguished by 10-year prescription of nonuse on April 19,1987.
The plaintiffs’ case hinges on their interpretation of the 1970 donation. In essence, they argue that the reservation pertaining to minerals in the 1970 donation did two things. First, it created a mineral servitude over Marie’s undivided three-fourth’s of the property. Second, Marie reserved her “open mine” rights as usu- *27 fructuary of an undivided one-fourth of the property, which plaintiffs equate to a mineral servitude to the depth of 9,059 feet.
Before analyzing the 1970 donation, we begin with the judgment of possession rendered March 23, 1965, and the effect of the open mines doctrine on the rights of Marie and her children. As stated, the judgment of possession recognized Marie as owner of one-half of the community property from her marriage to Elbert. As to Elbert’s half of the community property, Marie as legatee was sent into possession of one-half of Elbert’s share of their community property. Thus, Marie then owned outright three-fourth’s of the property. George and Burette were placed into possession of the ^remaining undivided one-fourth of the property, subject to a usu-fruct in favor of Marie.
Plaintiffs contend that the open mines doctrine must be applied to determine the actual mineral interests acquired by Marie, George, and Burette. Plaintiffs assert that at the time of the judgment of possession in 1965, the TP SUK Minor Unit No. 1 Well, which had been drilled to a depth of 9,059 feet, had been producing for almost nine years. They reason that, under the open mines doctrine, Marie’s usufruct included minerals as to all zones, reservoirs, and formations located less than 9,059 feet below the surface, while George and Burette had only the naked ownership of minerals located more than 9,059 feet below the earth’s surface. We find the plaintiffs’ reasoning and application of the open mines doctrine to be in error.
The case Gueno v. Medlenka, 238 La. 1081, 117 So.2d 817 (1960), addressed the open mines doctrine and the respective rights of a usufructuary and a naked owner under the Civil Code of 1870, which was in effect in 1965. In that case, there had not been any production of oil, gas or other minerals from the land prior to the creation of the usufruct by testament. After both the usufructuary and naked owners granted separate mineral leases covering the land, the issue presented was whether the usufructuary had any authority to grant a mineral lease or any right in the minerals to be produced from the land. The court relied on La. C.C. art. 552 (1870), which provided that a usufructuary has a right to the enjoyment and proceeds of mines and quarries in the land subject to the usufruct, provided the mines and | inquarries were actually worked before commencement of the usufruct; however, the usufructuary has no right to mines and quarries not opened. The Gueno court recognized that the law considered the exploration of oil and gas to be mining and that Article 552 (1870) applied to the exploration of oil and gas. Applying Article 552 (1870), the court determined that the naked owner, not the usufructuary, had the right to open new mines and explore for minerals on the land and that the usufructuary had no right to such minerals produced from the land. See also King v. Buffington, 240 La. 955, 126 So.2d 326 (1961).
Under the open mines principles as set forth in Article 552 (1870) and discussed in Gueno, supra, Marie as usufructuary had the right to one-fourth of the proceeds from the oil and gas production from the TP SUK Minor Unit No. 1 Well, which was producing at the time the usufruct began in 1965, and was thus an “open mine.”[4] The rights of the usufructuary of *28 land under the Code of 1870 and Gueno were to proceeds from the open mine. The landowner rights to explore for and produce minerals remained with the naked owners.
As the naked owners, George and Bu-rette had the operational interests giving them full use and enjoyment of any further mineral 1 n development on the land. Nothing in the open mines doctrine at the time limited their undivided one-fourth naked ownership interest to zones, reservoirs, or formations more than 9,059 feet below the earth’s surface. George and Burette had the overall right to the minerals in proportion to their one-fourth interest, subject to Marie’s rights as usufructuary to the proceeds of “open mines.”
Having established the respective interests of Marie, George, and Burette after the judgment of possession rendered in Elbert’s succession, we next consider the effect of the 1970 donation, the subsequent clarification instrument, and the correction instrument on the respective interests of Marie, George, and Burette.
A donation inter vivos is a contract by which the donor gratuitously divests himself of a thing in favor of the donee, who accepts it. La. C.C. art. 1468. A contract is interpreted to determine the common intent of the parties. La. C.C. art. 2045; Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145. When the words of a contract are clear, explicit, and lead to no absurd consequences, no further interpretation may be made to determine the parties’ intent. La. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning, with words of art and technical terms given their technical meaning when the contract involves a technical matter. La. C.C. art. 2047. Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
As stated in Stephenson, supra (citations omitted):
The determination of whether a contract is clear or unambiguous is a matter of law. Ambiguity exists as to the parties’ intent when the contract lacks a provision on the issue or when the language of the contract is uncertain or fairly susceptible to more than one interpretation.
Id., 45,296, p. 7, 37 So.3d at 1149.
In the 1970 donation, Marie made two dispositions. First, she donated to George and Burette, in equal portions, “[a]ll of her right, title and interest” in a “tract of land in Sections 26, 27, 34 and 35, Township 17 North, Range 16 West” (hereafter the “Elbert tract,” which included the disputed property). Second, she donated a smaller half-acre piece of property to George alone.[5] Focusing on the donation of the Elbert tract, Marie clearly and unambiguously gave all of her interests in the Elbert tract to her children. Regarding her three-fourth’s undivided interest, she con *29 veyed ownership of the land itself. Regarding the one-fourth undivided interest, Marie freed George and Burette’s naked ownership from her usufruct of the land.
However, the 1970 donation included the following reservation:
Grantor reserves unto herself all of the oil, gas and other minerals in and under said property during the remainder of her life, together with all income from minerals from said property.
This reservation of “all of the oil, gas and other minerals” for the property “during the remainder of her life” again requires a review of 11sthe extent of Marie’s retained rights to the minerals for her different undivided interests.
The first effect of the mineral reservation clause was that it created a limited lifetime mineral servitude over Marie’s three-fourth’s ownership interest.[6] This servitude would have included all exploration and production rights and would have necessarily encompassed 75 percent of any production income.
The second effect of the mineral reservation clause was that it provided a separate mineral right consisting of a usufruct over one-fourth of the income derived from the producing TP SUK Minor Unit No. 1 Well. Cf. La. R.S. 31:16 and 31:189. Marie did not create a servitude over the undivided one-fourth interest. As discussed, the rights of a usufructuary of land under the code of 1870 and Gueno, supra, were to proceeds from the open mine. The rights to explore for and produce minerals remained with the naked owner. A usufruc-tuary cannot create a mineral servitude by reserving her rights under the open mines doctrine.[7]
All of Marie’s mineral production income rights in both her newly created three-fourths mineral servitude and her one-fourth usufruct of the mineral income would have been subject to the existing oil and gas lease. Marie’s reservation of both interests would 114have assured her 100 percent of the lease royalty from the producing TP SUK Minor Unit No. 1 Well. Thus, the reservation of all minerals in and under the property “for the remainder of her life” necessarily included “all income” from such minerals.
The reservation in the 1970 donation was soon explained and changed when on October 10, 1970, Marie, George, and Bu-rette executed, in authentic form, the clarification instrument. Referencing the 1970 donation, the clarification instrument states that “it was the intention of all parties that [Marie] did reserve all usu-fruct of income from the property during the remainder of her life.” It goes on to state that the parties agree that “all income from minerals, timber, rights of way and any and all other income from said property is hereby the property of [Marie], and always has been her property during the remainder of her life.”
From our reading of the clear and unambiguous language of the clarification instrument, we find that the parties intended the new reservation language to wholly replace the language of the reservation in the 1970 donation to reflect their true intent. First, the clarification instrument in referencing the 1970 donation states that it *30 “was the intention of all parties ” (emphasis added). This language indicates that the expression of the mineral reservation in the 1970 donation did not reflect the parties’ true intent. Second, the common expression in both instruments for the reservation was that the rights were intended to exist “during the remainder of her life,” which the clarification instrument confirms was only a “usufruct of income” pertaining to the | ^mineral estate, the sole topic of reservation relevant to this matter in the 1970 donation. The clarification instrument further expanded the rights retained by Marie as usufructuary to include timber and other income. Third, the new expression within the reservation of a “usufruct of income” from the minerals necessarily eliminated the limited lifetime mineral servitude concept reflected in the language of the 1970 donation. A usufruct affecting rights in the minerals is not a mineral servitude. La. R.S. 31:26 and 31:189. We must also observe that the important use right of a mineral servitude for the exploration and development of property by drilling wells would be precarious indeed when made contingent on the lifetime of a person. That odd contingency in the 1970 donation only further confirms the parties’ true intent, as later clarified, to be a usu-fruct right affecting primarily the existing royalty production.
In summary, the fact that the new reservation in the clarification instrument, which was meant to clarify what the parties intended in the 1970 donation, expressed only a “usufruct” without mention of a mineral servitude confirms that Marie did not intend to reserve a mineral servitude in the donation. The apparent intent of the reservation in the 1970 donation was to provide a sufficient income for Marie during the remainder of her life. The clarification instrument likewise reflects and serves this intent by making certain that Marie derived all income from the property she donated to her children.
11fiFor these reasons, we find that, as a result of the clarification instrument, no mineral servitude was reserved or created by Marie in the 1970 donation. Instead, she reserved a usufruct of all the property’s income, while donating her undivided three-fourth’s interest in the land and her one-fourth interest as usufruct to George and Burette. Thus, the donation, as clarified, made George and Burette full owners of the Elbert tract, subject to the usufruct of income from the property in favor of Marie.
We note that Marie and George executed a third authentic act, the correction instrument, on January 12, 1971. This act was intended to correct the description of the half-acre tract donated to George. In the correction instrument, Marie reserved “the usufruct of all income from said property, including all income from minerals during the remainder of her life, together with the right to live in said property without payment of any rent.” The reservation of “all income from said property” is in accord with the reservation in the clarification instrument.
Now we turn to the credit sale deeds and the plaintiffs’ arguments concerning what Marie conveyed, the extent of the mineral servitude created in favor of George and Burette, and whether the mineral servitude was extinguished by the 10-year prescription of nonuse.
As with other contracts, deeds must be interpreted so as to ascertain the true intent of the parties. This is done by examining the deed itself without resort to extrinsic evidence, unless there is 117ambiguity or doubt as to the parties’ true intent. Doyal v. Pickett, 628 So.2d 184 (La.App. 2d Cir.1993); Williams v. Hawthorne, 601 So.2d 672 (La.App. 2d Cir. *31 1992). We find no ambiguity in the credit sale deeds.
George, Burette, and Marie all joined as vendors in the credit sale deeds conveying the disputed property to the Fords and Haskins. The Fords and Haskins each acquired 20.2 acre tracts that had been part of the Elbert tract. Both deeds state that Marie joined to convey “all of her right, title and interest in and to the property, together with all reservations of minerals, income rights, timber rights, all rights of usufruct and habitation and all other rights in and to the” property described in the deeds. Through this broad language, Marie divested herself of all her interests in the property. Thus, the Fords and Haskins received ownership of the disputed property unburdened with any interests or rights Marie may have had in such property. As previously addressed, Marie had no mineral servitude at the time of the sales to the plaintiffs.
George and Burette, by virtue of the 1970 donation and the clarification instrument, owned all of the land, including the mineral rights. George and Burette’s ownership was burdened only by Marie’s usufruct over the minerals and timber and other income from the property. In the credit sale deeds, George and Burette conveyed their interest in the disputed property, but they reserved “all of the oil and gas, but not coal, lignite or shale.” As the landowners, George and Burette had the right to explore for and produce minerals, and |isthey created mineral servitudes covering the land sold to the Fords and Has-kins for all depths and formations. La. R.S. 31:24. The mineral servitudes gave George and Burette the right to enjoy the disputed property for the purpose of exploration for and production of minerals and the reduction of minerals to possession and ownership. La. R.S. 31:21.
Also, George and Burette stipulated “that any income or revenue from the oil and gas rights shall be paid to [Marie] so long as she lives.” This acknowledged or effectively recreated the interest in favor of Marie in the nature of a usufruct of the income from her children’s oil and gas servitude for the remainder of her life. Nevertheless, Marie died two years after the credit sale deeds, and any interests she had through the stipulation or any usufruc-tuary income interests that, arguably, might have been conveyed to the Fords and Haskins terminated at her death. La. C.C. art. 567. From that point forward, George and Burette, and their successors-in-interest, had full, unburdened mineral servitudes of oil and gas to all depths on the disputed property.
Plaintiffs’ argument that the mineral servitudes covering the disputed property prescribed by nonuse is premised on the assertion that the reservations in the credit sale deeds applied to George and Bu-rette’s undivided one-fourth interest in oil and gas located more than 9,059 feet below the earth’s surface, where there was no production to interrupt prescription. As previously addressed in our discussion of the open mines doctrine, we find no merit to the | ^plaintiffs’ arguments concerning the open mines doctrine and how its application affected the rights of Marie, George, and Burette. The record shows that George and Burette’s mineral servitudes covering the Ford and Haskins’ tracts have not prescribed.
Prescription of nonuse commences on the date the mineral servitude is created. La. R.S. 31:28. Here, the mineral servi-tudes were created when the credit sale deeds were executed on April 19, 1977. Prescription of nonuse is interrupted by good faith operations for the discovery and production of minerals. La. R.S. 31:29. *32 Specifically applicable here is La. R.S. 31:37:
Production from a conventional or compulsory unit embracing all or part of the tract burdened by a mineral servitude interrupts prescription, but if the unit well is on land other than that burdened by the servitude, the interruption extends only to that portion of the servitude tract included in the unit.
The record shows that the TP SUK Minor Unit No. 1 Well began producing in 1956 and is still producing today. While the well is not located on the tracts sold to the Fords and Haskins, those tracts are within the geographical bounds of the production unit. Therefore, the prescription of non-use never commenced to run on the mineral servitudes created by George and Bu-rette in the credit sale deeds. The record does not show that the mineral servitudes have been lost by nonuse. For these reasons, we find no merit to the first assignment of error.[8]

120-Second Assignment of Error

The plaintiffs assert that the trial court erred in finding that the Lesters own the rights to the minerals under the disputed property. They argue that none of the judgments of possession or deeds in their chain of title purport to place the Lesters in possession of the mineral rights.
As stated above, the record shows that George and Burette established mineral servitudes covering the disputed property and that these servitudes have not prescribed as claimed by the plaintiffs. Moreover, the judgment of possession (Exhibit 19) rendered on April 17, 1979, in Marie’s succession placed George and Burette in possession in equal portions of all her property. Included under “Minerals” is an interest payable from Hurley Oil and Gas Company (“Hurley”) covering the “North 1212 feet of the NE ½ of Section 34, Township 17 North, Range 16 West.” This description appears to encompass the area from which the Ford and Haskins tracts were carved out.[9] The judgment of possession (Exhibits 20 and 22) [ 21rendered in 1982 in George’s succession placed Mary Elizabeth Gunning Lester (“Mary”) in possession of two-thirds of his estate and George Bryan Moncrief, his son, in possession of one-third of the estate. The estate included the minerals being produced by Hurley from the “Minor Gas Unit.” The record (Exhibit 21) further shows that George Bryan Moncrief conveyed to the Lesters all of the interest acquired by him in his father’s succession, including all min- *33 erais and specifically referring to those being produced by Hurley. Finally, Mary was the sole legatee in the succession of Burette and her husband in a judgment of possession (Exhibit 23) rendered December 19, 2002. This judgment of possession includes among the minerals those then being produced by Loutex Production Co. from “Minor # 1 Lease” covering the East half of Section 34. Thus, we find that this chain of title shows the Lesters to be successors-in-interests to the mineral rights at issue in this dispute. More importantly, the plaintiffs have not proved that they own the minerals.

Third Assignment of Error

The plaintiffs assert that the trial court erred as a matter of law in failing to find that a mineral lease executed by the Les-ters in favor of Chesapeake on June 6, 2009, and a “Memorandum of Oil, Gas And Mineral Lease” executed on June 9, 2009, are invalid insofar as they purport to cover the plaintiffs’ land. For the reasons already mentioned, we find no merit to this assignment of error.
CONCLUSION
122For the reasons stated, we affirm the judgment of the trial court denying and dismissing the claims of the plaintiffs. Costs of appeal are assessed to the plaintiffs.
AFFIRMED.

. The trial court conducted a bifurcated trial to first determine the ownership of the miner *24 al interests at issue.

. As shown by the property descriptions in the credit sale deeds, the Fords purchased the “West 750 feet of the North 1212 of the East Half of Section 34, Township 17 North, Range 16 West,” and the Haskins (Gene and his then wife Louise Waters Haskins) purchased the "East 750 feet of the West 1500 feet of the North 1212 feet of the East Half of Section 34, Township 17 North, Range 16 West.” The Haskins later divorced, and Mrs. Haskins conveyed her interest in the property to her former husband, who is a plaintiff in this matter.

. While plaintiffs sought to present expert testimony to counter that of the defendants, counsel for plaintiffs maintained that expert testimony was not proper on the issue concerning the interpretation of legal documents.

. La. R.S. 31:190 of the Mineral Code, which went into effect on January 1, 1975, adopted the principle stated in Article 552 (1870) by providing that a usufruct of land which is that of a surviving spouse in community includes the use and enjoyment of the landowner's rights in minerals as to mines or quarries actually worked when the usufruct was creat *28 ed. However, an amendment in 1986 (Acts 1986, No. 245, § 1), allows a surviving spouse usufructuary, absent any contrary provision in the instrument that creates the usufruct, to use and enjoy the landowner’s rights in minerals, whether or not mines or quarries were worked when the usufruct was created. However, the usufructuary is not entitled to execute a mineral lease without the consent of the naked owner. La. R.S. 31:190(B).

. The smaller tract donated to George is not relevant to this matter. We note that the 1970 donation’s reservation of Marie's right to live in the home "last above described” clearly refers to this smaller tract, which appears from Elbert's judgment of possession to have been the site of the Moncrief family home in Greenwood, Louisiana.

. Under La. R.S. 31:15, a landowner may reserve his right to explore and develop his land for the production of minerals and to reduce them to possession. So, when a landowner reserves "minerals,” it is understood that the landowner is creating a mineral servitude.

. As provided by La. R.S. 31:26, "A usufruc-tuary cannot establish a mineral servitude on the estate of which he has the usufruct even for the period of his usufruct.”

. Though not assigned as an error, the plaintiffs argue that the trial court erred in allowing the defendant’s expert, Morgan, to testify, while disallowing the testimony of their own expert, Downer. We note that Morgan’s testimony and Downer’s proffered testimony addressed the interpretation of Elbert’s judgment of possession, the 1970 donation, the clarification instrument, the correction instrument, and the two credit sale deeds to determine who owns the mineral rights at issue. The trial court indicated in its written reasons for judgment that it based its factual findings on the authentic acts and succession judgments in evidence and not on the parole evidence adduced at trial or the depositions offered into evidence. Having reviewed the competing expert testimony and other testimony and depositions in the record and having found little of assistance in these offerings, this court too bases its findings on the authentic acts and judgments of possession without regard to the parole evidence. Therefore, we will not consider the issue raised concerning the expert testimony.

. As stated, the parties introduced over 100 exhibits in the record with little, if any, testimony or explanation offered on the relevance of these exhibits. Thus, it was left for the court to attempt to parse the meaning and relevance of the various exhibits to the issues on appeal. We note that the trial court found many to be without any significant evidentia-ry value, and this court agrees.